UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

IN RE:

      EDWARD J. MCDERMOTT,               CASE NO. 06-61707

                         Chapter 7

                Debtor.

------------------------------------------------------------

ECONOMIC DEVELOPMENT GROWTH
ENTERPRISES CORPORATION and
UTICA INDUSTRIAL DEVELOPMENT
CORPORATION,

                Plaintiffs

        vs.                       ADV. PRO. NO. 07-80033

EDWARD J. MCDERMOTT,

                Defendants.

-------------------------------------------------------------

PARTIES:

SAUNDERS KAHLER, LLP            MERRITT S. LOCKE,. ESQ.
*Attorney for the Plaintiff*          Of Counsel
185 Genesee Street, Suite 1400
Utica, New York 13501-2194

EDWARD D. EARL, ESQ.
*Attorney for Debtor/Defendant*
4-6 North Park Row
Clinton, New York 13323


Hon. Diane Davis, United States Bankruptcy Judge

**MEMORANDUM-DECISION AND ORDER**

The Court considers herein the adversary proceeding commenced on behalf of the Economic Development Growth Enterprises Corporation ("EDGE") and Utica Industrial Development Corporation ("UIDC") (collectively "Plaintiffs") by the filing of a complaint on June 22, 2007, seeking a denial of discharge of a debt incurred by Edward J. McDermott ("Debtor" or "Defendant") pursuant to §§523(a)(4) and (6) of the Bankruptcy Code (11 U.S.C. §§101-1532) ("Code").  The Debtor filed his answer to Plaintiffs' complaint on July 18, 2007.

On November 7, 2008, the Plaintiffs filed a motion seeking summary judgment pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P."), incorporating Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.").  On December 15, 2008, the Debtor filed opposition to the Plaintiffs' motion and for the first time asserted the business judgment rule as a defense to the Plaintiffs' allegations in their complaint.  Following a hearing on December 18, 2008, the Court indicated that it would take the matter under advisement and afforded both parties an opportunity to brief the issue.

On June 5, 2009, the Court issued its Memorandum-Decision, Findings of Fact, Conclusions of Law and Order ("June 2009 Decision"), in which it held that the Debtor/Defendant was entitled to raise the business judgment rule in opposing the Plaintiffs' motion seeking summary judgment. In response to the Court's June 2009 Decision, the Debtor filed an Amended Answer on June 12, 2009, which included the defense of the business judgment rule.  On November 20, 2009, the Plaintiffs again filed a motion for summary judgment, to which the Debtor filed an objection on December 4, 2009.  Following review of the parties' affidavits and statements of undisputed facts,

3

as well as oral argument at the Court's regular motion term on December 10, 2009, in Utica, New York, the Court signed an Order on December 17, 2009, denying Plaintiffs' motion for summary judgment and scheduling the matter for trial (Dkt. No. 72).

A trial of the adversary proceeding was held at Utica, New York, on January 11, 2010. Plaintiffs called two witnesses, Shauna Papale ("Papale"), the Senior Vice President for EDGE, and the Debtor. Both parties were afforded an opportunity to file post-trial memoranda of law, and the matter was submitted for decision on February 16, 2010.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1), (b)(2)(I).

## FACTS[1]

At the trial, the Debtor testified that Integrated Sensors, Inc. ("ISI"), which was incorporated in 1986 by Debtor and Ronald Gouse ("Gouse"), was involved in research and development in the area of radar and infrared systems. (Transcript of January 11, 2010 Trial ("Tr.") at 32-33). Sensor

---

[1] The Court assumes familiarity with the June 2009 Decision. The parties have also provided the Court with a Joint Statement of Stipulated Facts (Dkt. No. 74), filed on January 4, 2010.

4

Applications, Inc. ("SAI") was incorporated in 1993 to "take prototype products that had been developed within ISI and to manufacture those products and to sell those products and to further those products in the marketplace." (Tr. at 33). At the time ISI was first incorporated, the Debtor and Gouse borrowed monies from Hayes National Bank, which was later acquired by the National Bank and Trust Company ("NBT"). According to the Debtor, he and Gouse also borrowed money from their pension accounts to provide initial funding to ISI. (Tr. at 32).

On or about October 14, 1993, Debtor and Gouse executed commercial guaranties of any indebtedness of ISI to NBT (Stipulated Facts at ¶ 36 and 38 and Exhibits 15 and 16). On July 22, 1994, SAI also executed a commercial guaranty of the indebtedness of ISI to NBT (Stipulated Facts at ¶ 40),[2] and the Debtor and Gouse executed commercial guaranties of any indebtedness of SAI to NBT (Stipulated Facts at ¶ 44 and 46 and Exhibits 28 and 29).

On April 8, 1999, ISI executed a Promissory Note in the amount of $330,000.00 in favor of NBT. (Exhibit 12). ISI also executed a Commercial Security Agreement in favor of NBT, pledging all of its accounts, contract rights, inventory, equipment and general intangibles as security for the repayment of the loan (Stipulated Facts at ¶ 33-34; Exhibit No. 13). On that date, SAI also executed a Commercial Security Agreement in favor of NBT, pledging all of its accounts, contract rights, inventory, equipment and general intangibles as security for the repayment of $270,000.00,

---

[2] According to an Intercreditor Agreement, dated July 23, 2003, between EDGE, UIDC, NBT, and SAI, NBT made a secured revolving line of credit loan to SAI of $130,000, on or around July 22, 1994. The 1994 loan was modified previously on or around April 8, 1999, to increase the maximum amount permitted outstanding on the loan. *See* Exhibit 53. The Intercreditor Agreement addressed the priority of the security interests of NBT, EDGE, UIDC and the City of Utica in SAI's assets, including certain items of machinery and/or equipment identified in Schedule A, attached to the Intercreditor Agreement. Under the terms of the Intercreditor Agreement, NBT's security interest in the machinery and equipment identified in Schedule A would be subordinate to that of EDGE and the UIDC. *Id.*

representing the indebtedness of SAI to NBT (Exhibit No. 14).[3]

As additional security for Debtor's SAI guaranty to NBT, the Debtor granted NBT a $62,500.00 mortgage on his residence, dated February 1, 2001 (Stipulated Facts at ¶ 48). As additional security for Gouse's ISI Guaranty to NBT, he pledged 1042 shares of General Electric Common Stock (Stipulated Facts at ¶ 49).

The Debtor testified that in 2002 both SAI and ISI applied to the Small Business Administration for loans. Eventually, the ISI loan application was withdrawn, and only SAI's application was considered and ultimately approved. *See* Plaintiffs' Exhibit 35. The loan amount totaled $118,300.00. *Id.* Both the Debtor and Gouse personally guaranteed the SBA loan to SAI by pledging their personal residences as security. (Tr. at 17). According to the Debtor, he and Gouse decided to withdraw the ISI application because it would have necessitated their pledging additional personal collateral. Schedule D, attached to the Debtor's petition, lists the SBA as a secured creditor with a mortgage on the Debtor's residence securing a claim of $12,000.00.

On July 23, 2003, SAI executed a Promissory Note in favor of Plaintiff EDGE in the amount of $46,700.00 (the "EDGE Note") (Stipulated Facts at ¶ 4 and Exhibit 39). On that date and to secure repayment of the EDGE Note, SAI executed two security agreements, one for goods and equipment, the other for accounts and inventory (Stipulated Facts at ¶ 5 and Exhibit 40). In addition to SAI's agreements, its companion company ISI executed a Corporate Guaranty, guaranteeing the debt of SAI to EDGE (Stipulated Facts at ¶ 7 and Exhibit 42). As part of said guaranty, ISI executed

---

[3] As of July 23, 2003, NBT held a first priority security interest in the accounts, contract rights, inventory, equipment, and general intangibles of SAI and ISI (Stipulated Facts at ¶ 50). The Court assumes that its security interest did not extend to that equipment identified in Schedule A of the Intercreditor Agreement. *See* Footnote 3.

two security agreements, one for goods and equipment and one for accounts and inventory (Stipulated Facts at ¶ 8 and Exhibit 43). Debtor also executed an Unconditional Guaranty on July 23, 2003 in regards to the debt of SAI to EDGE (Stipulated Facts at ¶ 10 and Exhibit 45).

On July 23, 2003, SAI also executed a Promissory Note in favor of Plaintiff UIDC in the amount of $46,700.00 (the "UIDC Note") (Stipulated Facts at ¶ 11 and Exhibit 46). On that date and to secure repayment of the UIDC Note, SAI executed two security agreements, one for goods and equipment, the other for accounts and inventory (Stipulated Facts at ¶ 12 and Exhibit 47). In addition to SAI's agreements, its companion company ISI executed a Corporate Guaranty, guaranteeing the debt of SAI to UIDC (Stipulated Facts at ¶ 14 and Exhibit 49). As part of said guaranty, ISI executed two security agreements, one for goods and equipment and one for accounts and inventory (Stipulated Facts at ¶ 15 and Exhibit 50.). Debtor also executed an Unconditional Guaranty on July 23, 2003, in regards to the debt of SAI to UIDC (Stipulated Facts at ¶ 17 and Exhibit 52).

According to the Debtor's testimony, at the time that the loans were made by the Plaintiffs in July 2003, they were provided with copies of the companies' financial statements that showed that SAI was operating at a loss and was dependent on ISI for monies. (Tr. at 51). The financial statements show that at the end of 2002, $407,000.00 had been written off or eliminated as an obligation owed by SAI to ISI for 2002, in addition to $705,000.00 that had been written off in prior years. *See* Exhibit B. By the end of 2003, $604,000.00 in current obligations, as well as an additional $1 million from prior years, had been written off or eliminated. *See* Exhibit C. According to the financial statements (Exhibits 1-C) under the heading of "Going Concern Matters," it was noted that the Debtors "were not in compliance with the covenants of their bank loan

7

agreements" and that NBT had the right to demand repayment.  There was also concern that various factors indicated the possibility that "ISI and SAI will be unable to continue as going concerns for a reasonable period of time."  *See, e.g.,* Exhibit A at 11.

Debtor further testified that ISI purchased equipment and paid for the leases of equipment that were used by SAI in its operations.  According to the Debtor, between 1995 and 2005 he personally invested approximately $230,000.00 into the business, which monies were never paid back to him.  (Tr. at 61).

On or about August 1, 2005, SAI defaulted on the UIDC Note (Stipulated Facts at ¶ 20).  On October 1, 2005, SAI also defaulted on the EDGE Note (Stipulated Facts at ¶ 18).  The Debtor filed a voluntary petition pursuant to chapter 7 of the Code on July 27, 2006.  In his schedules, he lists a debt of $26,834.00 owed to UIDC described as a "job development loan to SAI, January 2001 - December 2005."[4]  EDGE is not listed as a creditor in the Debtor's schedules.  The Debtor testified on cross-examination that the purpose of the EDGE and UIDC loans was to maintain employment and further employment of additional staff.  The monies were also used to buy equipment and as working capital in connection with a project for the Ford Motor Company. (Tr. at 35).

According to the Debtor, after SAI's incorporation, "ISI advanced monies, provided administrative support, accounting support, management support and loan personnel . . . and paid bills like the rent, advanced monies for payment of things like the SBA loan or the EDGE loan or the NBT line of credit.  So it would continually transfer funds into the accounts of SAI to meet its

---

[4]  At the trial, Papale explained that UIDC has a staff services agreement with EDGE to provide such services as general administration, including maintaining loan files and collecting on loans.  *See* Tr. at 4.

[SAI's] obligations." (Tr. at 35). The Debtor testified that "initially and continuing through its operation ISI would provide funding for purchase of equipment, for labor and it would advance monies to SAI of which most of those monies were never returned because SAI never - only in one or two years did it turn a profit." *Id.* It was the Debtor's testimony that "SAI could not exist as a separate corporation and never did." (Tr. at 36).

On or about December 31, 2005, SAI and ISI essentially ceased all operations (Stipulated Facts ¶ 25). At the time they ceased operations, both corporations were insolvent (Stipulated Facts at ¶ 26). According to the Debtor, at that time he was still involved with the winding down of the business, and there was some receivables that were due past that point in time. (Tr. at 13). He further testified that the business facility was actually vacated by February 1, 2006.

Debtor testified that in January 2006 in the process of winding down the affairs of the two corporations, he and Gouse retained counsel to provide advice on their responsibilities with respect to the two corporations. In the process of those meetings, the liabilities of the corporations were examined. As of approximately January 1, 2006, ISI had accounts receivable due from certain entities, including one from General Dynamics and another from Atomic Physics. (Tr. at 13). A payment of $84,439.00 was received from General Dynamics sometime after January 1, 2006 (Plaintiffs' Exhibit 94), and deposited into ISI's checking account sometime in February 2006. (Tr. at 14). A separate receivable was collected by SAI from General Motors in the amount of $34,500.00 (Plaintiffs' Exhibit 5) and deposited into SAI's checking account.

Debtor testified that most of the $84,439.00 received from General Dynamics was initially deposited into ISI's account with Citizen's Bank and used, in combination with other funds from SAI, to pay the SBA loan in April 2006. (Tr. at 22). This reduced the amount owed by SAI on the

9

SBA loan by $90,000.00. (Tr. at 25). The Debtor acknowledged, however, that ISI was not obligated to pay the debt owed to the SBA by SAI (Stipulated Facts at ¶ 33). Debtor described this as being "part of our overall plan" to avoid bankruptcy and pay off the various creditors with the expectation that he would be able to obtain a corporate level position with another company. (Tr. at 28-29). He acknowledged that the SBA was an unsecured creditor and did not have a security interest in the receivables of either company. However, from the Debtor's perspective, the SBA was simply one of a number of creditors that had to be paid. (Tr. at 29).

Debtor explained that NBT had a first priority interest in the companies' assets and that EDGE had a first priority claim on "very specific physical assets of Sensors Applications." (Tr. at 18). According to the Debtor, EDGE had a secondary interest in the accounts of ISI and SAI and a primary interest in specific equipment and intellectual property of SAI. (Tr. at 19 and Stipulated Facts at ¶ 52). In January 2006 a series of discussions took place with NBT to settle the outstanding corporate liability. (Tr. at 19-20).

As noted previously, the Debtor filed a voluntary petition pursuant to chapter 7 on July 27, 2006. Ultimately, an agreement was reached in October 2006 whereby the Debtor paid NBT $62,000.00 "which was the collateralized value on my house," which Debtor later sold in 2009 for approximately $210,000.00. (Tr. at 25 and 27). In addition, on April 25, 2007, the Court signed an Order approving a stipulation between NBT and the Debtor, which resolved disputed issues concerning the dischargeability of the debt owed to NBT. *See* Exhibit 56. Under the terms of the stipulation, the Debtor agreed to pay NBT $25,000.00 in 84 monthly installments of $377.32, commencing May 16, 2007. The Debtor granted NBT a security interest in the Debtor's residence "described more particularly in the Mortgage dated February 1, 2001, between NBT Bank, Debtor

and Mary C. McDermott," which security interest was newly negotiated on May 16, 2007. *Id.*; *see also* Exhibits 18 (Mortgage dated February 1, 2001) and 38 (Mortgage dated May 16, 2007). Debtor also agreed to execute and deliver to NBT a Note evidencing the indebtedness, which was deemed to be non-dischargeable under the terms of the stipulation pursuant to Code § 523(a)(4) and (6). The stipulation also provides that NBT Bank's security interest in the assets of ISI, Gouse and/or SAI assets, including "designs, plans, specifications, working models, contract rights, intellectual property, and/or other general intangibles," was to continue to the same extent and priority until the non-dischargeable debt was paid in full. *See* Exhibit 56.

## ARGUMENTS

With respect to their cause of action based on Code § 523(a)(4), Plaintiffs contend that the Debtor, as an officer/director of the two insolvent corporations, owed a fiduciary duty to the corporations' creditors to preserve the remaining assets for their benefit and that any intercompany transfers should have ceased until all of the creditors of both corporations were paid. Relying on the "trust fund doctrine," it is Plaintiffs' position that because the Debtor did not do this, he breached his fiduciary duty to the creditors of ISI by making the payment to the SBA on the debt owed by SAI and, in particular, the $84,439.00 paid to ISI, when ISI was under no obligation to pay the SBA. According to the Plaintiffs, the Debtor knew that the Plaintiffs had a security interest in ISI's accounts receivable and elected to use the proceeds to pay off a debt owed by SAI to the SBA, which the Debtor had personally guaranteed, thereby committing defalcation.

Debtor argues that the "trust fund doctrine" on which Plaintiffs rely imposes a duty on a

11

corporate officer/director to preserve the "remaining" assets for the benefit of unsecured creditors.

Debtor points out that given NBT's first priority security interest, there were no "remaining assets"

or accounts receivable to be preserved for unsecured creditors.  In the alternative, Debtor argues that

if the Plaintiffs are taking the position that they are beneficiaries of the "res," consisting of the

accounts receivables, then the "trust fund doctrine" does not apply because it does not protect

secured creditors such as Plaintiffs.

In response to the Plaintiffs' assertion that the payment to the SBA was fraudulent as a

matter of law pursuant to § 273 of the New York Debtor and Creditor Law ("NYD&CL"), the

Debtor points out that NYD&CL § 273  is a "constructive fraud statute," whereas Code § 523(a)(4)

requires a finding of conscious misbehavior or recklessness under *Denton v. Hyman (In re Hyman)*,

502 F.3d 61 (2d Cir. 2009), *cert. denied,* 129 S.Ct. 895 (U.S. Jan. 12, 2009).  Furthermore, the

Debtor argues that if the Plaintiffs had proceeded in state court under NYD&CL § 273 and the state

court had ordered that the $90,000.00 to the SBA was to be set aside, then any recovery would have

been subject to NBT's security interest and Plaintiffs would have received nothing.  Thus, Debtor

contends that the Plaintiffs are unable to prove any financial injury under their theory that the

payment to the SBA was constructively fraudulent.

Plaintiffs' second cause of action is based on allegations that the Debtor caused willful and

malicious injury to them for which the debt should be determined to be nondischargeable pursuant

to Code § 523(a)(6).  In this regard, the Plaintiffs assert that the Debtor intentionally used monies

from the ISI account to pay the SBA knowing that they were subject to Plaintiffs' security interest

and knowing that ISI had no contractual obligation to pay the SBA.

In response, the Debtor argues that since the Plaintiffs did not require that accounts

receivable be segregated into a separate account even after SAI and ISI had ceased doing business, his payment to the SBA, using the proceeds deposited into the ISI account, did not constitute conversion. Debtor contends that the Plaintiffs were aware of the course of dealing that existed between the two corporations whereby ISI often paid SAI's debts, as set forth in the financial statements provided to Plaintiffs at the time the loans were made. According to the Debtor, this course of dealing, including the payment to the SBA, represented at most a technical conversion which was neither willful nor malicious. In addition, the Debtor argues that the Plaintiffs have failed to establish any intent on the part of the Debtor to cause them injury, particularly given the fact that the Plaintiffs' security interest in the accounts receivable was subordinate to that of NBT. Debtor contends that nothing that he did placed the Plaintiffs in a worse position than they would otherwise have occupied had the transfer not been made given NBT's first priority security interest in the accounts receivable.

**DISCUSSION**

The statutory exceptions to the discharge of a debt pursuant to Code § 523(a) are to be narrowly construed in favor of a debtor in order to effectuate the fresh start policy of the Code. *Owens v. Miller (In re Miller)*, 276 F.3d 424, 429 (8th Cir. 2002). The standard of proof for a creditor opposing the dischargeability of a debt is preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991). In addition, it is necessary that the Plaintiffs establish every element of either Code § 523(a)(4) or (6); otherwise, the indebtedness is dischargeable.

### Code § 523(a)(4)

To prevent the discharge of their debt pursuant to Code § 523(a)(4), Plaintiffs must establish (1) that the Debtor was acting in a fiduciary capacity when the debt owed to the Plaintiffs arose, and (2) the Debtor committed fraud or defalcation in the course of the fiduciary relationship. *See Jafapour v. Shahrokhi (In re Shahrokhi)*, 266 B.R. 702, 707 (8th Cir. BAP 2001); *In re Pieper,* 119 B.R. 837, 840 (Bankr. M.D.Fla. 1990).

*Fiduciary Capacity*

While state law may be consulted in determining whether a trust exists, whether a "fiduciary" relationship exists is a matter of federal law for purposes of Code § 523(a)(4). *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934); *see also In re Dobrayel*, 287 B.R. 3, 14 (Bankr. S.D.N.Y. 2002) (indicating that "[t]he meaning of 'fiduciary capacity' under federal law is more restricted than under the more general common law or state law definition"). Furthermore, the concept of a fiduciary relationship under Code § 523(a)(4) is limited to technical or express trusts and is not applicable to trusts implied by contract.[5] *Id.* In addition, the trust must have existed prior to and independently of the act alleged and from which the underlying indebtedness arose. *Id.* (citations omitted).

An express trust requires "(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." *In re Blaszak*, 397 F.3d 386, 391 (6th Cir. 2005). There has been no evidence presented in the instant case of any intent to create a trust. In addition and according to the

---

[5] An "express trust" is "created with the settlor's express intent, usually declared in writing." BLACK'S LAW DICTIONARY 1549(8th ed. 2004). A "technical trust" is one "in which the trustee has no duty other than to transfer the property to the beneficiary." *Id.* at 1550.

testimony, there was no requirement that the corporations segregate any monies to be held in trust for the Plaintiffs, including the accounts receivable.  Nor was there any evidence identifying the Plaintiffs as the "definite beneficiaries" of a trust.  Therefore, the Plaintiffs rely on the "trust fund doctrine" recognized in New York as being applicable to insolvent corporations.  *See Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 550 (N.Y. 2000). Plaintiffs contend that the Debtor, as an officer and director of ISI and SAI, owed Plaintiffs, as creditors, a fiduciary duty to hold any corporate assets, including proceeds from accounts receivable of ISI, in trust for their benefit.

As observed by one court, the moment a corporation becomes insolvent its directors occupy a different relation than they did while the corporation was solvent. "'The assets of the corporation must then be regarded as a trust fund for the payment of all its creditors, and the directors occupy a position of trustees . . . .'"  *In re Reuscher*, 169 B.R. 398, 402 (S.D.Ill. 1994) (citing both Illinois and Pennsylvania cases).  Thus, the creditors of an insolvent corporation gain standing comparable to that of shareholders of a solvent corporation and can seek recovery from an officer or director based on a breach of his/her fiduciary duty.  *See Production Resources Group, LLC. v. NCT Group, Inc.*, 863 A.2d 772, 791-92 (Del.Ch. 2004).

As the court in *Production Resources* observed, "[a] strand of authority (by no means universally praised) therefore describes an insolvent corporation as becoming akin to a trust for the benefit of the creditors.  This line of thinking has been termed the 'trust fund doctrine.'  Under a trust fund approach, the directors become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firms assets."  *Id.,* citing, *inter alia*, *Geren v. Quantum Chemical Corp.*, 99 F.3d 401, 1995 WL 737512, at *3 (2d Cir. Dec. 13, 1995).

15

The court in *Production Resources* went on to emphasize that the claims remained derivative and "any recovery logically flows to the corporation and benefits the derivative plaintiffs indirectly to the extent of their claim on the firm's assets" based on the fact that a director's fiduciary duties still remain directed on behalf of the corporation itself. *Production Resources*, 863 A.2d at 792.

Admittedly, the court in *Production Resources* left open the possibility that a creditor might also have a direct claim against directors of an insolvent corporation. *Id.* at 800. However, in a later decision by the Supreme Court of Delaware, it was made clear that "individual *creditors* of an *insolvent* corporation have *no right to assert direct* claims for breach of fiduciary duty against corporate directors." *See North American Catholic Educ. Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del.Supr. 2007). The court in *Gheewalla* observed that

> [r]ecognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation. To recognize a new right for creditors to bring direct fiduciary claims against those directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors. Directors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation.

*Id.*

This Court is of the view that the "equity-like interest" created under the "trust fund doctrine" is insufficient for purposes of Code § 523(a)(4), particularly in light of the fact that it has application only to derivative claims asserted on behalf of a corporation and not to any direct claims like those of the Plaintiffs. To hold otherwise would arguably expand nondischargeability to any and all creditors with claims against the assets of insolvent corporations. Such a conclusion runs contrary to the "fresh start" policy underlying the Bankruptcy Code. *See In re Kaplan*, 162 B.R.

684, 704 (Bankr. E.D.Pa. 1993), *aff'd sub nom. Kaplan v. First Options of Chicago, Inc.*, 189 B.R.

882 (E.D.Pa. 1995) (observing that "the difficulty with finding that the relationship of the director

of a corporation to its creditors automatically gives rise to an express trust of all assets held by that

corporation for purposes of § 523(a)(4) broadens the scope of that provision to embrace a debtor-

creditor relationship . . . ."); *see also In re Cram*, 178 B.R. 537, 541 (Bankr. M.D.Fla. 1995) (finding

"[t]he relationship between a corporate officer and the corporation's creditors is not sufficient to

establish the fiduciary relationship required by § 523(a)(4)"); *but see In re Jacks*, 266 B.R. 728, 737

(9th Cir. BAP 2001) (finding that the trust fund doctrine implicated an express trust sufficient for the

application of § 523(a)(4)).

*Fraud and Defalcation*

Even if the Court were to conclude that the relationship created under the "trust fund

doctrine" was sufficient to create a fiduciary relationship between the Debtor and the Plaintiffs in

applying Code § 523(a)(4), there is still the burden imposed on the Plaintiffs to establish fraud or

defalcation on the part of the Debtor in the course of that relationship.  Recently, the Second Circuit

Court of Appeals considered allegations of defalcation and held that for purposes of Code §

523(a)(4), in order to establish defalcation, the Plaintiffs have the burden of showing "conscious

misbehavior or extreme recklessness - a showing akin to the showing required for scienter in the

securities law context."  *Hyman*, 502 F.3d at 68.  Thus, the Plaintiffs must show "an intent to

deceive, manipulate or defraud or knowing misconduct."  In the bankruptcy context, "a plaintiff

must demonstrate that the defendant had actual knowledge of the fiduciary duty that was breached

in order to establish that the resulting debt is non-dischargeable under § 523(a)(4)."  *In re Parra*, 412

B.R. 99, 106 (Bankr. E.D.N.Y. 2009); *see generally, Bank of Castile v. Kjoller (In re Kjoller)*, 395

17

B.R. 845, 851 (Bankr. W.D.N.Y 2008) (determining that the debtor should have an opportunity to establish when, if ever, she became aware of her fiduciary duty).

In this case, and assuming one existed, there is no evidence that the Debtor knew of any fiduciary duty that was owed to the Plaintiffs as creditors of ISI and SAI with respect to the accounts receivable.  Indeed, the Debtor testified that at the time the payment was made to the SBA using the proceeds from ISI's accounts receivable, he understood that NBT had a superior interest in said proceeds.  This does not indicate any intent to deceive or defraud the Plaintiffs.  The transfer to the SBA was made after obtaining legal advice and appears to have been made as part of an overall strategy to maximize what assets were available by negotiating with the various creditors.  Indeed, the Debtor testified that it was his belief that with his marketing assistance, any obligation to the Plaintiffs could be satisfied through the sale of certain assets in which they had a security interest.

As far as allegations of fraud by the Debtor, the evidence indicates that by paying the debt owed to the SBA, the Debtor was able to reduce his personal obligations stemming from his guarantee of the debt to the SBA, which was secured by his residence.  While Plaintiffs take the position that this constituted a wrongful dissipation of ISI's assets in which they had a security interest, the record shows that NBT's security interest was superior to the Plaintiffs in priority, and significant enough in amount, such that none of the proceeds would have reached Plaintiffs' security interest had the proceeds, in fact, been used to pay ISI's creditors.

Accordingly, the Court concludes that the Plaintiffs have failed to meet their burden of establishing not only the existence of a fiduciary relationship required pursuant to Code § 523(a)(4), they have also failed to establish fraud or defalcation on the part of the Debtor.

## Code § 523(a)(6)

Pursuant to Code § 523(a)(6), an individual debtor in a chapter 7 case is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(6). The terms "willful" and "malicious" are considered two distinct elements and the creditor has the burden of establishing both. *See Sells v. Porter* (*In re Porter*), 375 B.R. 822, 827 (8th Cir. BAP 2007), *aff'd,* 539 F.3d 889 (8th Cir. 2008); *In re Khafaga,* 419 B.R. 539, 548 (Bankr. E.D.N.Y. 2009); *In re Chaffee*, Case No. 07-11636, Adv. Pro. 07-90171, 2009 WL 2872834, at *3 (Bankr. N.D.N.Y. Jan. 12, 2009).

The term "willful" means deliberate or intentional. *See Kawaauhau v. Geiger (In re Geiger),* 523 U.S. 57, 61 (1998); *Porter*, 375 B.R. at 827. In addition, the injury, and not merely the act leading to the injury, must be deliberate or intentional. *Geiger*, 523 U.S. at 61-62; *see also Conte v. Gautam (In re Conte)*, 33 F.3d 303, 305 (3d Cir. 1994) (noting that § 523(a)(6) requires an intentional act that has the purpose to cause injury or that has a "substantial certainty" that injury will result; a high probability of causing injury is not enough). "Malice," on the other hand, requires conduct which is targeted at the creditor, at least in the sense that the conduct is certain, or almost certain, to cause financial injury. *Madsen v. Lease (In re Madsen)*, 195 F.3d 988, 989 (8th Cir.1999); *Jamrose v. D'Amato (In re D'Amato)*, 341 B.R. 1, 4-5 (8th Cir. BAP 2006). Malice requires conduct more culpable than that which is in reckless disregard of the creditor's economic interests and expectancies. *Porter*, 375 B.R. at 827. A debtor acts with malice by intending or fully expecting to harm the economic interests of the creditor. *Id.* A debtor's knowledge that he or she is violating the creditor's legal rights is insufficient to establish malice absent additional aggravating circumstances.

*Johnson v. Logue (In re Logue)*, 294 B.R. 59, 63 (8th Cir. BAP 2003). Thus, it must be established that the debtor intended the consequences of his act to cause harm to the creditor, not simply the act itself. *Geiger*, 523 U.S. at 61-62; *Porter*, 375 B.R. at 827.

Relying on *Geiger*, the court in *In re Kidd*, 219 B.R. 278 (Bankr. D. Mont. 1998) observed that

> a creditor, in order to prevail under § 523(a)(6), must demonstrate by a preponderance of the evidence, that the debtor desired to cause the injury complained of, or that the debtor believed that the consequences were substantially certain to result from the debtor's acts. In other words, in the case of a conversion, a creditor must show that a debtor, when converting collateral, did so with the specific intent of depriving the creditor of its collateral or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion. This subjective test focuses on whether the injury was in fact anticipated by the debtor and thus insulates the innocent collateral conversions from non-dischargeability under § 523(a)(6).

*Id.* at 285.

As observed in one prominent bankruptcy treatise,

> [t]ransfers in breach of a security agreement may give rise to nondischargeable liability when the debtor's conduct is knowing and certain to cause financial harm. (citations omitted). Unless the creditor can prove not only that the debtor knew of the security interest, but also that the debtor knew that a transfer of the property was wrongful and certain to cause financial harm to the creditor, the debt should not be found nondischargeable.

4 COLLIER ON BANKRUPTCY ¶ 523.12[3] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. Rev. 2008).

In this case, the Debtor testified that at the time he transferred the funds deposited into ISI's account into that of SAI for payment to the SBA, he understood that NBT had a first priority security interest in the accounts receivable. He also testified that while the Plaintiffs had a second priority security interest in the accounts receivable of SAI, they had a first priority security interest "on very specific physical assets of Sensors Applications. And we developed a plan to utilize those assets

20

and try to reach settlements with the creditors as best possible." (Tr. at 18-19).

On cross-examination, the Debtor testified that his

primary objective was to address the creditors of the corporations and use all the
assets of [sic] my disposable [sic] to do that. I had no intention of filing bankruptcy
when we formed our plan. So my entire effort was how do we pay the creditors, how
do we - - who can we negotiate with, who can we get settlements with. That was my
entire thought process in looking at all of the liabilities of the corporations.

(Tr. at 79).

The Debtor explained that the companies had a limited amount of cash and some capital

equipment and intellectual property. (Tr. at 71). In winding down the companies' operations in

January 2006, he and Gouse, in consultation with the corporations' attorney, tried to figure out how

to satisfy as many major creditors as they could. (Tr. at 71). It was the Debtor's testimony that

EDGE was actually twelfth on the list of creditors in terms of the amount owed and UIDC was

fourteenth on a list of approximately fifteen creditors. (Tr. at 70). The Debtor also indicated that all

of the assets of the companies had been disbursed by the time he filed his petition. (Tr. at 28).

According to the Debtor, between January and July 2006, he made several different

proposals to the Plaintiffs in an attempt to settle the corporate debt, including offering them a

product line/equipment that could be marketed and resold with his assistance.[6] (Tr. at 71-73). It was

the Debtor's opinion that the debt owed the Plaintiffs could have been satisfied had they opted to

place the "physical collateral" up for sale. (Tr. at 74). From the Debtor's perspective, the offer had

significant value "far above the outstanding debt to EDGE." (Tr. at 73).

---

[6] On redirect when questioned concerning the ability of the Plaintiffs to sell the equipment
without his assistance, the Debtor stated "Well, I don't know. I can't answer that question." (Tr.
at 84).

Based on the Debtor's testimony, which the Court finds to be credible, the Court concludes that the Plaintiffs failed to meet their burden by a preponderance of the evidence.  The Plaintiffs did not provide sufficient evidence in support of their position that the Debtor intended injury to them when he transferred the proceeds of the accounts receivable from ISI to SAI's account for ultimate payment to the SBA.  He offered them the equipment in which they had a security interest, and indicated a willingness to assist with the resale of said equipment.  While he admittedly knew of the Plaintiffs' security interest, Plaintiffs did not establish that the Debtor's actions in paying the SBA loan demonstrated anything more than a reckless disregard for their economic interests in his efforts to repay the creditors were paid from the limited resources of the companies.  Accordingly, the Court will dismiss the Plaintiffs' complaint to the extent that it seeks a finding of nondischargeability pursuant to Code § 523(a)(6).

## **CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that Plaintiffs' Complaint, seeking nondischargeability of their debt[7] pursuant to Code § 523(a)(4), is dismissed; and it is further

ORDERED that Plaintiffs' Complaint, seeking nondischargeability of their debt pursuant to Code § 523(a)(6) is dismissed.

---

[7] Plaintiffs' Complaint does not set forth the amount of the alleged debt in their Wherefore clause.  The Court believes that any such debt, for nondischargeability purposes, is limited to the amount of the proceeds from the account receivables of ISI that was transferred to SBA, namely $84,439.

22

Dated at Utica, New York
this 4th day of May 2010

/s/ Diane Davis
DIANE DAVIS
U.S. Bankruptcy Judge